IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JACQUELINE C. BOYD,

    Plaintiff,

v.                                                  CV 16-814 WPL/KK

SPRINGLEAF FINANCE MANAGEMENT
CORPORATION,

    Defendant.

## ORDER

Plaintiff Jacqueline Boyd filed suit against her former employer, Springleaf Finance Management Corporation ("Springleaf"), in New Mexico state court, alleging violations of the New Mexico Human Rights Act based on disability-related discrimination. (Doc. 1 Ex.1.) Springleaf removed the case to federal court based on diversity jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1441. (Doc. 1.) Springleaf has now filed a motion to compel arbitration of this dispute, pursuant to an allegedly binding arbitration agreement, and to stay this case pending arbitration. (Doc. 8.) Boyd opposes the motion to compel arbitration. (Doc. 9.) Being fully advised in these matters, I grant Springleaf's motion to compel arbitration, refer the parties to arbitration, and order that a status report concerning the status of arbitration be submitted no later than January 9, 2017.

### BACKGROUND

Unless otherwise noted, the background information comes from Boyd's complaint (Doc. 1 Ex. 1) or from the motion to compel arbitration (Doc. 8) when the facts do not conflict and the motion is more specific. Inclusion of background information in this section does not constitute a full or final adjudication of the facts in this case.

On March 27, 2008, Boyd applied for a job with American General Finance Management Corporation, which changed its name to Springleaf Finance Management Corporation on March 7, 2011. As part of her application, Boyd signed a document entitled "Applicant's Authorizations and Understandings." (Doc. 8 Ex. 1 at 8.) This document states, among other things, that:

> I understand that:
> . . .
> - An Employee Dispute Resolution Plan is in place at [Springleaf]. I understand and agree that I will be subject to the Plan. The Plan requires resolution of any applicant or employee dispute covered by the Plan through informal and formal means, including binding arbitration, if necessary. This Plan is the exclusive means for resolving employment disputes, including claims by applicants, except as otherwise provided by law. Under the Plan, employees do not have the right to file a lawsuit in state or federal court, but employees do have the right to file charges with the EEOC and similar state/local agencies in addition to mediation and arbitration. The details of the Plan, including any limitations or exclusions, are furnished to each employee upon hire and can be obtained by applicants upon written request.
>
> **By signing below, I certify that all statements made by me in this Employment Application and all other information I will provide during the application process, are or will be, true and complete. I acknowledge that any misrepresentations, falsifications, or omissions may be cause to reject my application, or terminate my employment if I am hired. I also indicate by signing below my agreement to all of the Authorizations and Understandings indicated above.**

(*Id.*) (emphasis in original). Boyd signed this document on March 27, 2008. She was hired on April 28, 2008.

On April 29, 2008, as a condition of employment, Boyd signed a document entitled "Employee Acknowledgement." (*Id.* at 10.) This document specifically pointed out several of Springleaf's business policies ("BPs"), including, in bold letters, "BP 1203 Employee Dispute Resolution Program." (*Id.*) One of the acknowledgments, in its own box, reads, "I acknowledge that I have read the on-line version of the AIG Employee Handbook dated 7/23/04." (*Id.*) Finally, the bottom of the "Employee Acknowledgment" reads, in bold letters, "[b]y signing below you

acknowledge that you have reviewed and agree to abide by the above referenced policies and additional acknowledgements." (*Id.*) Boyd's signature, printed name, and the date appear just below this statement.

Springleaf's Employment Dispute Resolution Program ("EDRP") is extensive. The first page of the EDRP reads, in bold letters, that "[e]mployment or continued employment after the Effective Date of this Program constitutes consent by both the Employee and the Company to be bound by this Program both during employment and after the termination of employment." (Doc. 8 Ex. 1 at 12.) The opening paragraph goes on to state that "[t]he Employee and the Company further agree to be bound by the mutual promises contained in the Program." (*Id.*) The express purpose of the EDRP is "to create an exclusive procedural mechanism for the final resolution of all disputes falling within its terms." (*Id.*)

While the EDRP details many procedural aspects, I highlight the relevant portions here. The EDRP specifically invokes the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., as the law applying to and governing the EDRP. (*Id.* at 12, 15.) Under the EDRP, a "dispute" means:

> any legal or equitable claim, demand or controversy, in tort, in contract, under statute, or alleging violation of any legal obligation, (i) between the Company and an Employee or any other person bound to resolve disputes under this Program; (ii) between Employees if in any way related to their employment with the Company; and (iii) asserted against a Third Party Beneficiary which relates to, arises from, concerns, or involves in any way:
> 1. the Program, the Description, or the Rules;
> 2. the employment, reemployment, or application for employment of an Employee, including the terms, conditions, or termination of such employment and events that may occur after any such termination of employment; . . .
> 4. any other matter related to the relationship between an Employee and the Company including, by way of example and without limitation, all claims or disputes arising out of the interpretation or enforcement of any duties, rights, or obligations of the Parties set forth in any employment agreement, all claims amounting to a common law tort, and all claims under any federal, state, or local human rights or employment rights statutes and regulations or wage and hour statutes

3

> and regulations or wage and hour statutes and regulations, including, but not limited to Title VII of the 1964 Civil Rights Act, the Age Discrimination in Employment Act of 1967, the Rehabilitation Act of 1973, the Americans with Disabilities Act, the Family and Medical Leave Act, Title 42 U.S.C. Section 1981, the Civil Rights Act of 1991, the Fair Labor Standards Act, . . . and any similar state or local statute or regulation, or any state or local retaliatory discharge statute or regulation, whether the basis for the dispute arises at the time of application for employment, during employment or as a consequence of the termination of employment or as a consequence of the Company's attempt to enforce an employment agreement provision after termination of employment; . . .

(*Id.* at 12-13.)

The EDRP goes on to reiterate that it "applies to and binds the Company, each Employee who is in the employment of the Company or who makes application for employment with the Company on or any time after the Effective Date of this Program . . . ." (*Id.* at 14.) The EDRP again states, in bold letters, that

> an application for employment, employment or continued employment after the Effective Date of this Program constitutes consent by both the Employee and the Company to be bound by this Program during the pre-employment process, during employment, and after the termination of employment. The Employee and the Company further agree to be bound by the mutual promises contained in the Program.

(*Id.* at 17.) The EDRP became effective on June 1, 1999, and was amended effective October 1, 2012. (*Id.* at 12-13.) Additionally, the EDRP clarifies that "[a]ny court of competent jurisdiction may compel a Party to proceed under these Rules and may enforce any award made as authorized by law." (*Id.* at 21.)

The EDRP is clear that Springleaf may terminate or amend the EDRP "by giving 30 days [sic] notice to current Employees" but that no amendment or termination will apply to disputes that have "accrued or for which a Party has filed a charge or claim with a regulating agency, court or the AAA, prior to the effective date of the" amendment or termination. (*Id.* at 15.)

In her Affidavit, Boyd swears that she did not go through any type of training, at any point, with Springleaf. (Doc. 9 Ex. 1 at 1.) She further states that, the day after accepting the job at Springleaf, she was "handed a stack of paperwork and told to sign an Employee Acknowledgment form," but "was never given time to review the [EDRP] before signing the Employee Acknowledgment." (*Id.*) Furthermore, Boyd says that she was told to review the paperwork at home, on her own time, and was "never told that by signing the Employee Acknowledgment form that [she] would be relinquishing [her] rights to pursue any employment claims against Springleaf in court." (*Id.* at 2.)

Boyd suffered a traumatic injury which fractured several of her vertebrae. It is unclear when or how this injury occurred, but her injuries resulted in limitation on her ability to lift, bend, sleep, work, sit, and stand. Boyd had two spinal surgeries in December 2013 and was absent from work for several months. When she returned to work, she had physician-imposed restrictions on lifting and was limited to working forty hours per week.

Throughout 2014 and into 2015, Boyd requested a laptop to work from home, assistance from her supervisor, and training on new policies, but was denied on all fronts. She was unable to get her physician to lift the forty-hour-per-week restriction. Nonetheless, Boyd received a performance award in late 2014.

In February 2015, Boyd's supervisor told her that she needed to increase the volume of her sales and improve her performance in two out of three areas. By April 2015, Boyd had met two of her three performance goals.

Boyd was terminated for substandard performance on April 23, 2015.

Boyd brought suit for one count of disability-based discrimination, in violation of the New Mexico Human Rights Act, based on Springleaf's failure to accommodate her disability, failure to provide training and assistance, and terminating her employment. (Doc. 1 Ex. 1.)

### DISCUSSION

"[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Alwert v. Cox Commc'ns, Inc.*, --- F.3d ---, ---, No. 15-6076 (10th Cir. Aug. 26, 2016) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)); *see also AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986) ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.").

I begin with a strong presumption that the dispute is arbitrable. The FAA, rather than contract law, creates the "federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). The FAA provides that any "written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Supreme Court described this section as "a congressional declaration of a liberal federal policy favoring arbitration agreements." *Moses H. Cone*, 460 U.S. at 24. The term "involving commerce" is interpreted broadly. *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273-74 (1995). The Court went so far as to say that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the

contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Id.* at 24-25; *see United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582-83 (1960) ("An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."). "In the absence of any express provision excluding a particular grievance from arbitration, . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail . . . ." *Warrior & Gulf*, 363 U.S. at 584-85.

The parties do not dispute that the alleged agreement involves commerce. Therefore, the FAA applies.

Boyd contends that the parties did not agree to arbitrate because the arbitration agreement lacks consideration, is illusory, and the EDRP is internally inconsistent, evincing that no valid contract was ever formed. (Doc. 9.) Additionally, Boyd argues that the acknowledgment on her job application does not create a binding contract to arbitrate because the agreement was not supported by consideration and because the EDRP was not provided with the application and she "did not know what she was signing." (*Id.* at 4-5.)

"State law principles of contract formation govern the determination of whether an agreement to arbitrate has been reached." *Dumais v. Am. Golf Corp.*, 150 F. Supp. 2d 1182, 1190 (D.N.M. 2001) (citing *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1287 (10th Cir. 1997)); *see also First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

I address each of Boyd's arguments separately, beginning with the pre-employment "Applicant's Authorizations and Understandings." Boyd argues that her signature on this page, which acknowledges, in relevant part, that the EDRP applies to applicants as well as employees

(Doc. 8 Ex. 1 at 8), does not constitute her consent to be bound by the EDRP because she "did not know what she was signing" and was not provided a copy of the policy before signing. (Doc. 9 at 4-5.) While the EDRP was not provided at the time of application, Applicant's Authorizations and Understandings page states that a copy of the EDRP "can be obtained by applicants upon written request." (Doc. 8 Ex. 1 at 8.) "Generally, a party who executes a written contract with another is presumed to know the terms of the agreement, and to have agreed to each of its provisions in the absence of fraud, misrepresentation or other wrongful act of the contracting party." *Smith v. Price's Creameries*, 650 P.2d 825, 829 (N.M. 1982). Boyd does not contend that there was fraud, misrepresentation, or any other wrongful act by Springleaf. Boyd's argument that she did not know what she was signing is unavailing under the circumstances.

Boyd next contends that her signature on the Applicant's Authorizations and Understandings page of her employment application was not supported by consideration, and therefore did not create a contract. Boyd relies heavily on *Piano v. Premier Distributing Co.*, 107 P.3d 11 (N.M. Ct. App. 2004), for the proposition that Springleaf's ability to alter, amend, or terminate the EDRP with thirty days' notice renders the agreement illusory and unsupported by consideration. (Doc. 9 at 3-5.)

In *Piano*, the New Mexico Court of Appeals considered an arbitration agreement that was presented to an at-will employee, some two years after she was hired, and that she was required to sign as a condition of continued employment. The defendants argued that "either its continued at-will employment of Plaintiff or its reciprocal promise to submit to arbitration" was "sufficient consideration to support enforcement" of the agreement. *Piano*, 107 P.3d at 14. The court ultimately concluded that the agreement was not supported by consideration and a contract was never formed. *Id.* at 16.

As to the continued at-will employment relationship, the court noted that plaintiff was an at-will employee before signing the agreement and remained an at-will employee after signing the agreement; that plaintiff's continued at-will employment "placed no constraints on Defendant's future conduct"; and that "[Defendant's] decision to continue Plaintiff's at-will employment was entirely discretionary." *Id.* at 14. Based on these facts, the court concluded that "this promise was illusory and not consideration for Plaintiff's promise to submit her claims to arbitration." *Id.*

As to the defendant's contention that its reciprocal promise to arbitrate disputes constituted consideration, the court rejected this argument. The agreement allowed the defendant to change the agreement, in its sole discretion, provided certain formalities were met, but was silent as to plaintiff's approval or assent to any modifications. *Id.* at 15. The court found that the agreement gave "Defendant unilateral authority to modify the [agreement]" and did not require "Plaintiff's approval before altering the terms of the [agreement]; Defendant 'remains free to selectively abide by its promise to arbitrate.'" *Id.* at 16 (quoting *Heye v. Am. Golf Corp.*, 80 P.3d 495, 500 (N.M. Ct. App. 2003)). Thus, "[defendant's] promise to arbitrate is illusory and is not consideration for Plaintiff's promise." *Id.*

In 2006, the New Mexico Court of Appeals decided *Sisneros v. Citadel Broadcasting Co.* 142 P.3d 34 (N.M. Ct. App. 2006). In *Sisneros*, the plaintiff signed a form acknowledging receipt of the employee handbook, which included a provision stating that defendant "reserves the right to terminate or amend this [arbitration] policy at any time, except that any termination or amendment will not apply to claims which accrued before the amendment or termination." *Id.* at 36. Eight months later, the parties entered into a new, written employment agreement for two years, with an additional one-year option, during which time plaintiff could be terminated for any

reason or no reason, provided he was given six months' notice or six months' pay. *Id.* Three months after signing the new employment agreement, plaintiff was terminated without cause. *Id.* at 37.

The court remanded *Sisneros* on other grounds, but specifically addressed the issue of an illusory arbitration clause. *Id.* at 42-43. The court found that the limitation on amendment—that any amendment to the arbitration clause will not apply to claims which accrued before the amendment or termination—constituted a restriction on the defendant's "right to terminate or amend the agreement to arbitrate." *Id.* at 43. "Thus, once an employee's claim accrues, [the defendant] is bound to its agreement to arbitrate the dispute." *Id.* The court concluded that the agreement to arbitrate was not illusory. *Id.* The court went on to specifically distinguish *Piano* because the agreement in *Piano* allowed "the employer to change the agreement at any time," but "[u]nlike the agreement in [*Piano* and other] cases, the agreement in [*Sisneros*] restricts [the defendant's] right to amend or terminate the arbitration agreement once an employee's claim against [it] accrues. This is in no way illusory, and it is consideration for the arbitration agreement." *Id.*

Boyd did not address *Sisneros* in her briefing, nor did she disclose that *Piano* had been expressly distinguished, by the same court, on facts similar to those at issue in this case.

The provision at issue in this case makes clear that, like in *Sisneros*, both parties are bound by the agreement to arbitrate as soon as a claim accrues, notwithstanding Springleaf's ability to otherwise amend or terminate the EDRP. Like *Sisneros*, Springleaf does not have an entirely unfettered right to unilaterally amend or terminate the EDRP. Accordingly, under controlling New Mexico law, the mutual agreement to arbitrate any dispute constitutes adequate consideration.

Despite Boyd's contrary contention, she did receive a benefit in exchange for her signature: Springleaf was bound by the EDRP and the agreement to arbitrate as soon as any claim accrued, even though Springleaf could unilaterally amend or terminate the EDRP with thirty days' notice. Boyd's signature on the Applicant's Authorizations and Understanding was supported by consideration and created a binding contract.

I turn now to Boyd's arguments about the Employee Acknowledgement that she signed on April 29, 2008. First, Boyd argues that the EDRP contains internally contradictory and ambiguous language because Springleaf reserved the right to amend or terminate the EDRP, even though the EDRP purports to be binding on both Springleaf and the employees. Next, Boyd contends that the arbitration agreement was based on continued employment and is illusory. Third, Boyd again argues that she not provided time to review the EDRP before signing the Employee Acknowledgement and that she "was never told that she would be relinquishing any rights to file an employment claim in court." (Doc. 9 at 7.) Finally, Boyd argues that there was no "meeting of the minds" when she signed the Employee Acknowledgement form, and as such, the arbitration agreement is not a valid contract.

Boyd's argument that the EDRP is internally inconsistent and ambiguous based on Springleaf's reservation of the right to amend or terminate the EDRP with 30 days' notice to current employees is unfounded. The EDRP is not internally inconsistent or ambiguous. Boyd argues that, because she was not provided the right to terminate or approve the amendments to the EDRP, Springleaf's right to amend or terminate the EDRP is inconsistent with its mutual promise to be bound by the EDRP. The New Mexico Court of Appeals addressed this issue in *Sisneros* and found that an employer's right to amend or terminate does not render the promise

illusory provided that the employer is bound when a claim accrues. 142 P.3d at 43. The EDRP is not susceptible to multiple interpretations on this point. Boyd's argument is without merit.

Boyd again relies on *Piano* for the proposition that the EDRP and the arbitration agreement arose in the context of continued at-will employment. Boyd argues that the one day difference between her date of hire—April 28, 2008—and her date of signing the Employee Acknowledgement and agreeing to the EDRP—April 29, 2008—is similar to the facts in *Piano* and Boyd's signature on the Employee Acknowledgement was not a condition to employment. Unlike the plaintiff in *Piano*, who was presented with the arbitration agreement two years after starting employment, Boyd signed the Employee Acknowledgement one day after being hired. At best, it stretches credulity to believe Boyd's argument that she was continuing at-will employment by signing the Employee Acknowledgement. Additionally, the Employee Acknowledgement is quite clear that "[r]eview and acceptance of [Springleaf's] company policies is a condition of employment." (Doc. 8 Ex. 1 at 10.) Perhaps most relevantly, the ability to amend or terminate the arbitration agreement in this case materially differs from the provision in *Piano*: as previously discussed, Springleaf was bound to the terms of the EDRP and the arbitration agreement as soon as a cause of action accrued. In *Piano*, the company could amend or terminate the agreement at any time, such that the arbitration agreement "placed no constraints on Defendant's future conduct." 107 P.3d at 14. That is simply not the case here. The EDRP placed adequate constraints on Springleaf's future conduct to render the agreement supported by consideration and not illusory.

As to Boyd's third argument, I again note that, "[g]enerally, a party who executes a written contract with another is presumed to know the terms of the agreement, and to have agreed to each of its provisions in the absence of fraud, misrepresentation or other wrongful act

of the contracting party." *Smith*, 650 P.2d at 829. Again, Boyd does not contend that there was fraud, misrepresentation, or any other wrongful act by Springleaf. Boyd's argument that she did not know what she was signing is unavailing under the circumstances.

Finally, Boyd cites no authority or additional argument to support her contention that there was no meeting of the minds when she signed the Employee Acknowledgement. Boyd appears to argue that, even though none of the foregoing arguments were persuasive, the sum of these parts means that no valid contract was formed. I do not agree. Boyd voluntarily signed the Employee Acknowledgement, explicitly stating that she had read the online employee handbook. (Doc. 8 Ex. 1 at 10.) The fact that she may not have done so, or may not have understood all of the provisions in the handbook, does not mean a valid contract was not formed under New Mexico law.

I find that the arbitration agreement is valid. As previously noted, the parties do not dispute that, if valid, the EDRP governs this dispute. Accordingly, I further find that the arbitration agreement covers this dispute and must be submitted to binding arbitration in accordance with the EDRP. Under the circumstances, the FAA requires that I refer this case for arbitration and stay these proceedings pending the outcome of that arbitration. *See* 9 U.S.C. § 3.

## CONCLUSION

Springleaf's motion to compel arbitration (Doc. 8) is granted. I hereby compel the parties to arbitration pursuant to the terms of the EDRP that Boyd signed and dated on April 29, 2008, subject to any valid amendments to the EDRP made before this claim accrued. Further, this case is stayed pending resolution of Boyd's claims in arbitration. The parties shall file a status report by January 9, 2017, concerning the status of arbitration. Failure to report on the status of arbitration may lead to dismissal of this case for lack of prosecution.

IT IS SO ORDERED.

_____
William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.